1
2
3
4
5
6            UNITED STATES DISTRICT COURT
7            EASTERN DISTRICT OF WASHINGTON
8

MARION E. YOUNG,

9         Plaintiff,                        NO.  CV-05-407-RHW

10        vs.

11   R. JAMES NICHOLSON, Secretary        **FINDINGS OF FACTS AND**
     of DEPARTMENT OF VETERANS           **CONCLUSIONS OF LAW**
12   AFFAIRS, and the DEPARTMENT
     OF VETERANS AFFAIRS,
13
14        Defendants.

15        Plaintiff brings the above-captioned cause of action, asking the Court to

16   review the decision of the Merit Systems Protection Board upholding the

17   termination of her employment from the Veterans Affairs Medical Center, and

18   asserting additional claims of discrimination on the basis of disability, failure to

19   provide reasonable accommodations, violations of the union contract, constructive

20   termination, hostile work environment, and involuntary retirement.

21        The parties agreed to have the Court hear this case on the administrative

22   record.  On December 8, 2006, a bench trial was held on the administrative record.

23   Plaintiff was represented by Julie Wilchins; Defendants were represented by

24   Andrew Biviano.

25        Having fully reviewed all the materials submitted by the parties and the

26   record in this matter, the Court enters the following Findings of Fact and

27   Conclusions of Law.

28

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 1**

**FINDINGS OF FACT**

1. Plaintiff Marion Young has been totally deaf since birth, due to maternal measles during pregnancy (R. 646). American Sign Language (ASL) is her primary language. *Id.* English is her second language (R. 650). Plaintiff reads English between a second and third grade level (R. 1767).

2. Plaintiff began working for the Veterans Affairs Medical Center (VAMC), located in Spokane, Washington, in 1987, as a data transcriber/keypunch operator (R. 647). When her job became obsolete in 1994, she transferred to the file department. *Id.* During the first thirteen years she worked at the VAMC, Plaintiff consistently received positive performance evaluations (R. 1227-1269).

3. Since the early 1990s, Plaintiff was one of the few deaf employees employed at a federal agency in Eastern Washington (R. 1736).

3. In 1994, Plaintiff began having problems with her then supervisor Christina O'Dell-Holloway (R. 647). Plaintiff believed other people were being promoted before her, and she was being denied accommodations and training. *Id.* In 2000, Plaintiff filed a complaint with the EEO, alleging that she was being harassed by her co-workers and supervisor (R. 648).

4. In order to settle her complaint, Plaintiff and the VAMC agreed to transfer Plaintiff to a position as a prosthetics purchasing agent. *Id.*

5. During the negotiations that were conducted to facilitate the transfer, Plaintiff was told she would receive appropriate and adequate training and reasonable accommodations to allow her to be successful at her new position in the prosthetics department *Id.*

6. The agency then created a new position as prosthetics clerk, and it was hoped that she would be promoted to prosthetics purchasing agent with a corresponding higher GS grade as she completed her training (R. 1913-15).

7. Plaintiff was told she would be provided with interpreters during training,

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 2**

and that she would be provided with classes and schooling as needed for her to be successful (R. 648). Plaintiff was also told that her supervisors and co-workers would be trained on how to work with people who are deaf. *Id.* As a result of these representations, Plaintiff agreed to move to the prosthetics department and agreed to settle her EEO complaint (R. 649).

8. Plaintiff moved to the prosthetics department in November, 2000, and signed the settlement agreement in February, 2001 (R. 649).

9. During Plaintiff's first month of employment, interpreters were provided for her approximately once a week for half a work day at a time, then the provision for an interpreter tapered off (R. 649).

10. Mr. Guy Lounsbury was Plaintiff's direct supervisor. Pursuant to VAMC policy, a VAMC employee's direct supervisor is responsible for making an initial determination as to whether an employee with a disability will receive a reasonable accommodation, and what type of accommodation the employee might receive (R. 1992). Mr. Lounsbury had no experience or training in communicating with someone who is deaf and uses ASL to communicate. At the time he became her supervisor, Mr. Lounsbury did not consult with any experts or specialists regarding the necessary accommodations that would be required by Plaintiff[1] (R. 1921).

---

[1]Mr. Lounsbury testified that he met with Sandra Carr in November, 2000 (R. 1920). During this time frame, Ms.Carr was employed as a Deaf and Hard of Hearing Specialist at the Eastern Washington Center for the Deaf and Hard of Hearing, in Spokane, Washington. According to Mr. Lounsbury, they discussed setting up a visual link to the fire alarm system, and talked about general needs in terms of dealing with somebody with hearing impairment. *Id.* Ms. Carr disputes that she met with Mr. Lounsbury in November, 2000. Instead, she testified that the first meeting between her and Mr. Lounsbury occurred after she contacted Mr.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 3**

11.   Plaintiff experienced some difficulty in performing her job, in part because
      ALS was her primary language.[2]  In order to accomplish her job duties,
      Plaintiff used a number of training manuals that were complicated and
      lengthy (R. 650).  The manuals contained words that she did not know, or
      did not know how to use.  *Id.*  Consequently, she did not thoroughly

---

Lounsbury and set up an appointment in June, 2001 (R. 1798).  Mr. Lounsbury testified that he communicated with Ms. Carr without the use of interpreters (R. 1920).  Ms. Carr is deaf and she typically uses an interpreter for conversations with hearing people (R. 1797).  The Court finds that if Mr. Lounsbury met with someone regarding the physical accommodations Plaintiff would need while working in the prosthetics department, it was not Ms.Carr.  Moreover, it is clear that Mr. Lounsbury did not contact either the Eastern Washington Center for the Deaf and Hard of Hearing or the Washington Division of Vocational Rehabilitation with regard to any particularized assessment of Plaintiff's needs in relationship to the prosthetics position (R. 1797, 1736).

[2]John Evans testified that ALS is as different from English as English is from Italian (R. 1740).  Mr. Evans is employed at the Washington State Department of Vocational Rehabilitation (DVR) as the statewide program manager (R. 1734).  He explained that a highly intelligent person who speaks English might go to Italy and be completely lost in terms of comprehending or understanding the written or spoken language.  *Id.*  Jennifer White testified that ALS is an inflective language; that is, an accent on a word indicates whether it is the subject or object, rather than its placement in the sentence (R. 1749).  Ms. White is a vocational consultant and direct of Able Opportunities, Inc, a vocational consulting agency certified as a Community Rehabilitation Program by the Washington Department of Vocational Rehabilitation (R. 1744).  She stated that ASL is an atopic-comment language, in which a general idea is expressed first, followed by commentary on that idea, in a similar fashion to a newspaper headline (R. 1749).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 4**

1     understand these manuals. *Id.*

2 12. Plaintiff asked to have an interpreter work with her to help her understand

3     the manuals (R. 650-51). These requests were denied. *Id.* Plaintiff

4     attempted to teach herself out of the manual using an English dictionary (R.

5     652). She asked for and received assistance from other VA employees who

6     helped her learn computer skills and helped her learn how to draft

7     correspondence and other documents. *Id.*

8 13. Plaintiff asked to take work-related courses on work time that would have

9     helped her perform her job duties (R. 652). This request was denied. *Id.*

10     She asked for a deaf dictionary,[3] and training or assistance in writing letters.

11     *Id.* This request was denied. She asked for training on how to write letters.

12     *Id.* This request was denied.

13 14. During the year she worked in the prosthetics department, her co-workers

14     received 86 hours and 55.5 hours, respectively, and she received 25 hours of

15     training (R. 655).

16 15. Mr. Lounsbury would not let her keep her personal items in a cupboard

17     above her desk because the cupboards were "VA property" (R. 662).

18 16. During her tenure in the prosthetics, at times, Plaintiff would be left in the

19     prosthetics department over the lunch period (R. 654). This happened when

20     the rest of the staff attended training provided by manufacturers of

21     prosthetics (R. 1972). Plaintiff opted not to go because interpreters

22     generally were not provided for these session. *Id.*

23 17. When Plaintiff was left in the department by herself, Mr. Lounsbury would

24     lock the door from the outside. For many months, Plaintiff did not know

25     that the door was locked at the time, but she became aware of it and

26

27 ——————————

28     [3]Ms. White testified that a deaf dictionary provides American Sign Language signs for English words.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 5**

questioned Mr. Lounsbury regarding the locked door (R. 655, 671).[4]

Mr. Bedwell testified that he remembers on two occasions when he made plans to have lunch with Plaintiff, the door was locked, and there was no way to get Plaintiff's attention (R. 462). Mr. Lounsbury's explanation for locking the door was because he did not want Plaintiff to interact with the patients because of her disability (R. 463, 671).

18.  Many times when the interpreter was providing interpretative services to Plaintiff, Mr. Lounsbury would disrupt their work and often interrupt their training (R. 1793).

---

[4]The following e-mail exchange took place between Plaintiff and Mr. Lounsbury:

From:       Lounsbury, Guy R.
Sent:       Thursday, August 16, 2001 9:13 AM
Subject:    CLOSING THE OFFICE DOOR

Marion,
        I would like you to explain why, when no one else is going to be inthe ffoce you insist on having the office door remain open. Because of your disability you are not able to interact with patients should they come in the office. I feel it would be more appropriate to close the door and have a sign indicating when the office staff will be available.
        Please explain clearly so I can address your concerns and possibly find an alternative solution to the problem.

Guy

From:       Young, Marion E.
Sent:       Thursday, August 16, 2001 9:19 AM
Subject:    CLOSING THE DOOR

guy,
you are insult me as I am disability you should not right to say tome and I have to right to open the door to kept the air out of the office and I went to irm to fix my password. You did not see what I am doing

From:       Lounsbury, Guy R.
Sent:       Thursday, August 16, 2001 9:33 AM
Subject:    CLOSING THE DOOR

When there is no other office staff present I would to close the door because you are not able to help the patients because you can not hear them and would have a great deal of difficulty talking to them. I need to know if there is a reason why you do not want the door close. It is not a matter of you having a right to have an open door.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 6**

19.  Plaintiff began experiencing extreme anxiety, and sought doctor's care and missed work because of her anxiety; her doctors encouraged her to find another job at the VA (R. 517-530).

20.  On June, 2001, Sandra Carr,[5] Plaintiff, and an interpreter met with Mr. Lounsbury (R. 1798).  At this meeting, Ms. Carr reiterated the need for Plaintiff to obtain interpreters and further training, but Mr. Lounsbury dismissed her requests as "unreasonable."  *Id.*

21.  At a second meeting with Ms. Carr, Mr. Lounsbury presented a proposed agenda, in which he wanted to explore whether Plaintiff had a learning disability, and he questioned whether Plaintiff was capable of becoming a purchasing agent (R. 672).

22.  In July, 2001, Plaintiff again met with Ms. Carr and Mr. Lounsbury and again requested training and interpreters (R. 1799).  Mr. Lounsbury criticized Plaintiff's work product and continued to suggest that she was not qualified for the position (R. 676, 1801).  He continued to refuse to provide any type of accommodation.  *Id.*

23.  On September 14, 2001, Mr. Lounsbury initiated an informal performance improvement plan process.  The purpose of the plan was to improve Plaintiffs's communication with Mr. Lounsbury, and to improve her ability to follow his instructions (R. 677).  In October, 2001, he met with Plaintiff and identified areas that he thought were unsatisfactory in Plaintiff's performance (R. 678).  On October 23, 2001, he wrote up a formal performance improvement plan (R. 679).

---

[5]At the time of the meeting, Ms. Carr was employed as a Deaf and Hard of Hearing Specialist at the Eastern Washington Center for the Deaf and Hard of Hearing.  Currently, she is employed as a job developer with Tesh Industries in Coeur d'Alene, Idaho, for Washington Division of Vocational Rehabilitation in Spokane, Washington.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 7**

24. Around this time, Mr. Lounsbury suggested to Plaintiff that she apply for disability retirement (R. 1780; R. 1765).

25. In November, 2001, Plaintiff began the filing process for disability retirement (R. 664). As part of the application process, she provided a copy of her entire medical file to the VA.

26. On November 9, 2001, an e-mail was distributed among the management team that discussed the appropriate course of action while Plaintiff's application was pending (R. 1221).

27. At some point, there was talk that a position in the mailroom would be suitable. Mr. Lounsbury spoke to the mailroom supervisor and discussed the fact that some of the equipment required audible cues (R. 711) Mr. Lounsbury also expressed concern that the mailroom would lose its volunteers if Plaintiff worked for the mailroom. Mr. Lounsbury ultimately concluded that Plaintiff would not be successful working in the mailroom or any other position at the VA, and expressed his reservation to the mailroom supervisor (R. 1952). The mailroom supervisor declined to accept Plaintiff for employment in his department.

28. Things came to a head on November 19, 2001. Plaintiff had a confrontation with Mr. Lounsbury about her completing a particular task. Afterward, she felt sick, left work, went to the VAMC heath center accompanied by Mr. Bedwell, and was placed on "medical leave from [her] current work environment due to stressors." She never returned to work at the VA. During this time, she was paid through her sick leave and through her leave transfer program. Her paid leave expired on December 31, 2001 (R. 1695).

29. Plaintiff's request for disability retirement was ultimately denied on April 23, 2002.

30. In response, the VA sent her a letter notifying her that she was now in AWOL (Absent Without Leave) status (R. 20).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 8**

31.  Plaintiff sent Defendants a letter notifying them that she had filed a request for reconsideration (R. 96).  This request was denied in October 1, 2002.  Through negotiations, Plaintiff was carried with leave without pay status (LWOP) until October 20, 2002 (R. 1695).

32.  On October 9, 2002, the VA sent Plaintiff a second letter advising her of her AWOL status.  (R. 769).  Plaintiff was told it was not an acceptable option for her to stay absent from work without approved leave; and if her absence continued, the VA would begin formal action to remove her from VA employment.  *Id.*

33.  On April 18, 2003, the VA sent Plaintiff a third letter again advising her of her AWOL status and asking whether she intended to return to work, submit medical documentation for her absence, or resign (R. 769).  She was again advised that if she failed to inform the VA of her decision, a recommendation for removal would be made.  She failed to respond to the letter.

34.  During this time, Plaintiff was attempting to locate medical personnel who were proficient in dealing with deaf persons, but she was not successful (R. 395).

35.  On May 12, 2003, Plaintiff was issued a letter of proposed removal, citing her absence without leave from October 22, 2002 through May 9, 2003 (R. 771).

36.  A meeting was held on May 29, 2003.  Plaintiff attended the meeting with her father, Tom Williams, Jane Schilke, Kathy Brown, and an interpreter (R. 1796).

37.  Plaintiff stated that she might be able to come back to work, and that there might be some work that she could do without getting stressed out (R. 1796).

38.  Mr. Williams stated that Plaintiff would have to return to her old job under the same condition or be fired (R. 1796).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 9**

39.  On June 26, 2003, the agency issued a letter sustaining the proposed removal and advised Plaintiff that her removal would be effective July 11, 2003 (R. 772).

40.  In September, 2003, Plaintiff filed a formal EEO complaint (R. 393-395). On December 14, 2004, the removal was upheld by the Department of Veterans Affairs, Office of Employment Discrimination Complaint Adjudication (Ct. Rec. 34, Ex. B).

41.  Plaintiff appealed this final agency decision (FAD) to the Merit Systems Protection Board (MSPB). The Board upheld the agency's removal in December, 2005 (R. 2098).

42.  In support of her discrimination claims, Plaintiff provided expert testimony regarding the nature of her disability and the available accommodations that could have been provided to her throughout her tenure at the VAMC. Specifically, Plaintiff provided Declarations from John Evans, Program Manager for the Washington State Division of Vocational Rehabilitation; Jennifer L. White of Able Opportunities, a vocational consulting agency certified as a Community Rehabilitation Program by the Washington Division of Vocational Rehabilitation, Inc.; Dr. Wendy Marlowe, Clinical Neuropsychologist, who specializes in clinical neuropsychology and language pathology; and Sandra Carr, a job developer for the Washington Division of Vocational Rehabilitation. The experts were unanimous in concluding that VAMC failed to take any reasonable steps to accommodate Plaintiff and they all agreed that with reasonable accommodation, she could perform her job. The experts identified numerous agencies that VAMC could have contacted to obtain information regarding available services that could have been provided to Plaintiff, many at no charge to the VAMC. They also set forth the various types of accommodations that could have been put in place to allow Plaintiff to be successful as a prosthetics clerk or

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 10**

1    purchasing agent.

2  43.    Defendants did not provide any expert testimony, other than the testimony of

3        the employees at the VAMC.  These employees, notably Mr. Lounsbury, had

4        concluded that there were no reasonable accommodations that could be put

5        in place, other than the provision of interpreters at Mr. Lounsbury's

6        discretion.  None of these employees had experience or expertise in dealing

7        with deaf employees.

8  44.    The Court finds Plaintiff's expert opinions highly persuasive.

9                        CONCLUSIONS OF LAW

10       Plaintiff asks the Court to overturn and vacate the final decision of the

11   MSPB; declare that Defendants discriminated against her on the basis of her

12   disability; reinstate Plaintiff to her position with the VAMC; and provide for

13   compensatory damages.  Plaintiff also asks that the Court reverse and remand to

14   the MSPB so it can address Plaintiff's claims for involuntary retirement, hostile

15   work environment, and constructive discharge.

16  **A.    Standard of Review**

17       Plaintiff is bringing a "mixed case," that is, one that involves both a

18   personnel action and a claim of discrimination.  *Washington v. Garrett*, 10 F.3d

19   1421, 1428 (9th Cir. 1993).  In this situation, this Court has jurisdiction to review

20   the lawfulness of the personnel action as well as the discrimination claim.  *Id.*   The

21   Court conducts a *de novo* review of Plaintiff's discrimination claims and reviews

22   the MSPB's decision under a deferential standard.  5 U.S.C. § 7703(c);  *Garrett*, 10

23   F.3d at 1428.  Under this standard, the Court will uphold the MSPB's decision

24   unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in

25   accordance with law; obtained without procedures required by law, rule, or

26   regulation having been followed; or unsupported by substantial evidence.  *Id.*

27

28

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 11**

**B.    *De Novo* Review of Discrimination Claims**

Plaintiff argues that Defendants discriminated against her on the basis of her disability when they failed to provide reasonable accommodations, that her removal was discriminatory because it was motivated by her disability, and Defendants failed to engage in the interactive process.  Plaintiff also asserts that Defendants created a hostile working environment based on her disability.

**(1)    Federal Rehabilitation Act of 1973**

The Federal Rehabilitation Act of 1973 (29 U.S.C.A. §§ 701-794) establishes the Rehabilitation Services Administration and authorizes programs for the furnishing of vocational and rehabilitative services to disabled persons, for the promoting of employment opportunities in the public and private sectors for disabled persons, for the constructing and improving of rehabilitation facilities, and for the barrier-free reconstructing of public facilities.  The Act provides a private case of action in favor of persons subjected to disability discrimination by the federal government employing agencies.  *See Prewitt v. United States Postal Service*, 662 F.2d 292, 303 (5th Cir. 1981).

**(a)    Failure to Provide Reasonable Accommodation**

Federal agencies have an affirmative duty to provide reasonable accommodations for the known physical and mental limitations of an otherwise "qualified individual with a disability," unless the agency can demonstrate that the accommodation would impose an "undue hardship."  29 C.F.R. § 1614.203(b)(2). In *Buckingham v. United States*, the Ninth Circuit held that the Rehabilitation Act mandates that federal employers have an affirmative obligation to accommodate that goes beyond mere nondiscrimination.  998 F.2d 735, 740 (9th Cir. 1993).

Plaintiff has the burden of proving that she is a qualified handicapped individual.  *Id.*  A "qualified handicapped" individual is one who, with or without reasonable accommodation, can perform the essential functions of their job.  *Id.*  If accommodation to his or her handicap is required to enable them to perform

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 12**

essential job functions, the plaintiff must only provide evidence sufficient to make at least a facial showing that reasonable accommodation is possible. *Id.*

Plaintiff must also show that "the suggested accommodation would, more probably than not, have resulted in [her] ability to perform the essential functions of [her] job." *Id.* at 742. The burden then shifts to Defendants to show that the suggested accommodation is unreasonable. *Id.*

### i.    Whether Plaintiff is a Qualified Individual with a Disability

As a threshold matter, Defendants challenge whether Plaintiff is a qualified individual with a disability. According to Defendants, "it is not Plaintiff's deafness that makes her unable to perform her job, but the fact that she never learned how to read." (Ct. Rec. 32, p. 15). This assertion highlights Defendants' failure to understand the true nature of Plaintiff's disability.[6]  It is true that Plaintiff reads between a second and third grade. Her reading ability, however, is tied directly to her deafness and the fact that ASL is her primary language. John Evans stated that Plaintiff's situation is similar to other deaf employees' situations (R. 1740). Mr. Evans explained that because her primary language is ASL, she has difficulty reading, writing and comprehending English. *Id.*  Notably, Mr. Evans

---

[6]The Court notes that Defendants' statement that Plaintiff never learned how to read is not supported by the record. Specifically, Dr. Wendy Marlowe states that Plaintiff's intellectual ability is rated in the high average range (R. 1764). Dr. Marlowe states that Plaintiff's word recognition skills ranged up to about third grade level in comparison with a normal hearing population educated in the United States, and her reading comprehension was at approximately the end of the second grade level in comparison with a hearing population (R. 1767). Thus, the evidence shows that Plaintiff can, in fact, read English. Moreover, Jennifer White reports that the average deaf high-school graduate in the United States reads at a fourth-grade level.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 13**

1  stated that one of the misconceptions many employers who have never worked

2  with a deaf employee before is that ASL is a form of English.  *Id.*  Plaintiff,

3  however, is able to use ASL to understand concepts involving the English

4  language, and her use of ASL is consistent with her good intelligence (R. 1765).

5      Although Plaintiff reads English at a third-grade level, she does have

6  difficulty communicating in English.  A review of the e-mails written by Plaintiff

7  evidences this fact (R. 668, 669, 674, 671, 677).  This does not mean, however,

8  that Plaintiff could not meet the requirements of the position of prosthetics clerk or

9  prosthetics purchasing agent with reasonable accommodation.  On the contrary,

10  Plaintiff presented credible evidence to show that she has the necessary skills to

11  perform these positions, with reasonable accommodations.

12      The Court finds credible the testimony of Jennifer White and Dr. Marlowe,

13  both of whom concluded that with appropriate accommodations, Plaintiff could

14  have performed the essential functions of her job in the prosthetics department (R.

15  1748, 1772).  Defendants did  not provided any evidence to refute these

16  conclusions.  Instead, Defendants rely on the testimony of Mr. Lounsbury, who

17  concluded that Plaintiff did not have the necessary skills to perform the position,

18  without considering or exploring any reasonable accommodations.

19      Further, Mr. Lounsbury gave Plaintiff a favorable performance appraisal for

20  the period between April 1, 2000, and March 31, 2001 (R. 511-12).  Also, there is

21  nothing in the record to indicate that a higher level of reading was required for the

22  position than what Plaintiff could have obtained if properly accommodated.

23      The Court rejects Defendants' argument that because Plaintiff filed an

24  application for disability retirement, she is precluded from arguing that she is a

25  qualified individual with a disability who can perform the essential functions of her

26  position.  *See Cleveland v. Policy Mgmt. Sys. Corp,* 526 U.S. 795, 797-98 (1999)

27  (finding that an ADA claim of ability to work with accommodation was not

28  inconsistent with receipt of SS Disability Insurance based on "inability to do

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 14**

substantial gainful work in the national economy")' *Norris v. Sysco Corp.*, 191 F.3d 1043, 1048-49 (9th Cir. 1999) (ruling that judgment as a matter of law was improper where plaintiff bringing ADA claim had applied for and accepted disability benefits).

Also, Plaintiff was encouraged by the VA to seek the disability benefits. Plaintiff testified that she did not want to apply for disability retirement and she would rather work, but she concluded that she did not have any choice, since Defendants continued to fail to reasonably accommodate her. That decision should not be now held against her. *See Szedlock v. Tenet*, 139 F. Supp. 2d 725, 733 (E.D. Va. 2001) (affirming award of lost wages on Rehabilitation Act claim where the plaintiff applied for and accepted disability retirement as "the direct result of defendant's failure to accommodate her disability.").

The Court concludes that Plaintiff has established that she is a qualified individual with a disability.[7]

### ii.    Whether Plaintiff's Claims are Time-Barred

Plaintiff is asserting three claims for failure to accommodate: (1) the failure to provide interpreters and communication assistance at her request; (2) the failure to find another position for her or remove her from Mr. Lounsbury's supervision; and (3) the failure to engage in the mandatory interactive process while she was employed at the VA.

---

[7]Additionally, in the Final Agency Decision, the VA's Office of Employment Discrimination Complaint Adjudication found that management had testified that Plaintiff was qualified to perform the essential functions of her position as Prosthetics Clerk (Ct. Rec. 34, Ex. B). It found that Plaintiff was a qualified individual with a disability who was subjected to an adverse employment action when she was terminated from the agency effective July 11, 2003, and concluded that Plaintiff had established a prima facie case of disability discrimination. *Id.*

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 15**

1    Defendants argue that Plaintiff's claims for failure to accommodate her by

2  providing interpreters and communication assistance fail because they are time-

3  barred.  Plaintiff's last day working on the job was November 19, 2001, after

4  which she did not have any contact with Defendants until April, 2003.[8]

5  Under the federal regulations, aggrieved persons who believe they have been

6  discriminated against on the basis of a handicap must consult with an EEOC

7  counselor prior to filing a complaint in order to try to informally resolve the matter.

8  29 C.F.R. § 1614.105(a).  This consultation must occur within 45 days of the date

9  of the matter alleged to be discriminatory, or in the case of personnel action, within

10 45 days of the effective date of the action.  *Id.*   Failure to comply with the

11 regulations is "fatal to a federal employee's discrimination claim."  *Cherosky v.*

12 *Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003).  The Supreme Court has held that

13 each denial for a request for accommodation is a discrete act, accruing on the date

14 of denial of the requested accommodation.  *National Railroad Passenger Corp. v.*

15 *Morgan*, 536 U.S. 101, 122 (2002).  It is undisputed that Plaintiff did not consult

16 with an EEO counselor after her last day on the job, which would be the latest date

17 that any specific request for an interpreter or communication assistance could have

18 been denied.

19    Plaintiff argues that the continuing violation doctrine allows her claims for

20 denial of specific requests for accommodation to survive.  The Supreme Court in

21 *Morgan*, however, limited the continuing violation doctrine to claims based on

22 hostile work environment.  It explicitly stated that "[e]ach discrete discriminatory

23 act starts a new clock for filing charges alleging that act."  *Id.*

24    Moreover, in *Cherosky*, the Ninth Circuit addressed this same issue.  In that

25 case, the plaintiffs contacted the EEO in August, 1997, after the U.S. Postal

26 ───────────────

27    [8]Defendants concede that Plaintiff's claim for failure to accommodate for

28 failing to assign her to a new position, or to remove her from Mr. Lounsbury's

supervision is timely.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 16**

Service denied their requests for respirators made in October 1994. *Cherosky*, 330 F.3d. at 1245. The Circuit held that because the plaintiffs did not initiate contact with an EEO officer within 45 days of the denial of their requests to wear respirators, the claims were time-barred. *Id.* at 1248. The Circuit specifically rejected the argument that denial of a proposed accommodation can be a continuing violation.[9] *Id.*

Plaintiff has not argued that her claim regarding the failure to provide specific accommodations should be equitably tolled. Accordingly, the Court concludes that Plaintiff cannot challenge the denial of specific requests for accommodation and communication assistance that occurred prior to the limitations period, which at the latest would begin to run on November 20, 2001, because she did not initiate contact with a counselor within 45 days of the denial.

### iii.    Failure to Engage in the Interactive Process

Plaintiff argues that the Rehabilitation Act requires that employers engage in a mandatory interactive process, that Defendants failed to engage in the interactive process, and liability is appropriate because a reasonable accommodation without undue hardship to the employer was possible. The Court agrees.

In *Humphreys v. Memorial Hospitals Ass'n*, the Ninth Circuit held that once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in the interactive process with the employee to identify and implement appropriate reasonable accommodations. 239 F.3d 1128, 1137 (9th Cir. 2001). "The interactive process requires communication and good-faith exploration of possible accommodations between employers and

---

[9]The Circuit noted, however, that because the plaintiffs were still employees of the U.S. Postal Service, the time-bar could be cured by making a request for an accommodation, and if the request was denied, then filing a complaint with the EEOC within the 45 days. *Id.* at 1248. Obviously, this is not an option in Plaintiff's case.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 17**

individual employees, and neither side can delay or obstruct the process." *Id.*

"Employers, who fail to engage in the interactive process in good faith, face

liability . . . if a reasonable accommodation would have been possible." *Id.* The

duty to accommodate "is a continuing duty that is not exhausted by one effort." *Id.*

(citations omitted).

Specifically, the Ninth Circuit noted:

> Moreover, we have held that the duty to accommodate "is a 'continuing' duty that is 'not exhausted by one effort.' " *McAlindin*, 192 F.3d at 1237. The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "[i]f a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective.

*Id.* at 1138.

Thus, in addition to meeting to discuss possible accommodations, the VA

had a duty to explore further arrangements to reasonably accommodate Plaintiff's

disability when it was clear the accommodations that were being provided were not

working. *Id.* Moreover, when the VA denied Plaintiff's request for interpreters

and communication assistance, it had a duty to suggest alternative solutions, or

explore with her the possibility of other accommodations. *Id.*

The Court concludes that the VA utterly failed to meet its obligation to

engage in the interactive communication process. The record demonstrates

Defendants did nothing to educate its staff in regard to the needs of deaf

employees. Mr. Evans testified that it was his opinion that the VA failed to

properly identify, utilize or bother to contact any of the resources that were

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 18**

available to it in designing and implementing a reasonable accommodation plan that might have allowed Plaintiff to be successful in her job in the prosthetics department (R. 1738).  Mr. Evans explained that when the Washington Division of Vocational Rehabilitation is contacted by an employer of a person with a disability, a DVR employee would conduct an individualized assessment of the situation, which would include looking at the employee's job requirements along with a determination of the functional abilities and limitations of the employee in question (R. 1737).  The evaluation would pinpoint barriers to job performance and identify resources available to design a reasonable accommodation plan that would remove any barriers to employment (R. 1737).  Mr. Evans indicated  reasonable accommodation plan would include intensive interpretation during the "front end" training; ongoing and regular interpretation; communication assistance with terminology in operational manuals and other written materials; job-related instruction and training; and personalized assistance and supportive management, including extended "on the clock" training to ensure that the written materials Plaintiff was working with were fully and adequately translated from English to ASL[10] (R. 1742).

There is nothing in the record to indicate that this type of assessment process was ever completed at the VA.  The depositions of Mr. Williams, Mr. Lounsbury, and Ms. Brown indicate that none of these VA managers ever contacted the DVR on behalf of Plaintiff, and Mr. Evans reports that to the best of his knowledge, no management personnel at the VA ever contacted DVR to request any services on behalf of Plaintiff (R. 1736).  Mr. Evans indicated that Plaintiff was an enrolled client with the Washington State Division of Vocational Rehabilitation at the time of her employment with the VA, and as such, would have been eligible to receive

---

[10]Mr. Evans reported that these types of accommodations are provided to deaf employees at the Social Security Administration and these employees have excelled in their jobs (R. 1742).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 19**

1  numerous services and supports to maintain her employment and that these

2  services and supports could have been provided at no cost to the agency.  *Id.*

3        Indeed, Defendants admitted at oral argument that throughout Plaintiff's

4  tenure at the VA, the VA was ignorant with regard to the needs of a deaf employee,

5  and stated that if the VA had done such an assessment, it was very likely it would

6  have provided the necessary accommodations as suggested by the experts.

7        What did happen was clear, however.  Plaintiff would request

8  accommodations.  Mr. Lounsbury, who had no training, expertise, or

9  understanding of the needs of deaf employees, would decide that an interpreter was

10  not necessary, and would deny the request, or would require that Plaintiff  read the

11  manuals first before an interpreter would be provided (R. 512).  As Mr. Evans

12  explained, requiring Plaintiff to read the manuals before an interpreter would be

13  provided is analogous to telling a person with a disability who uses a wheelchair

14  that there is a bathroom for physically disabled persons available at the top of a set

15  of stairs (R. 1738).  The person in the wheelchair cannot get there so the bathroom

16  is inaccessible.  *Id.*  Likewise, Plaintiff could not read the manuals or understand

17  them without the availability of an interpreter so they were inaccessible to her

18  despite the promise of an interpreter later.  *Id.*  Mr. Evans concluded that Mr.

19  Lounsbury's requirement that she read the manuals before he would provide an

20  interpreter doomed her to failure in her job in the prosthetics department (R. 1738).

21  Ms. White equated the requirement that Plaintiff must first read the manuals before

22  receiving interpreter assistance to asking a non-German speaking individual to take

23  a math test in German; rather than measuring the individual's math skills, such a

24  test would measure their German skills (R. 1749).

25        The Court concludes that this duty to engage in the interactive process was

26  ongoing and continued up to the day that Plaintiff was removed from her position

27

28

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 20**

at the VA.[11]  The Court concludes that Plaintiff's extended absence from work was the direct result of stress and anxiety that was caused by Defendants' failure to engage in the interactive process while Plaintiff was employed in the prosthetic department.  Thus, rather than demanding that Plaintiff submit medical justification, resign, or return to work in the same position, Defendants should have discussed with Plaintiff the type of accommodations that would be required to allow her to be successful in the position.  This is especially true when it became clear that the accommodations that Defendants were providing were not working.  *See Humphrey*, 239 F.3d at 1138.

Defendants argue that it should not be held liable because Plaintiff failed to adequately participate in the interactive process by failing to provide any additional medical information.  Defendants did not support its argument with any citation to case law.  While the Court agrees that neither side can obstruct or delay the interactive process, it concludes that Plaintiff's failure to supply additional medical information did not negate Defendants' affirmative duty to engage in an interactive communication with Plaintiff.  The requested medical records had nothing to do with Plaintiff's disability, which was deafness, and would not have assisted in developing a reasonable accommodation plan.

The Court concludes that the VA failed to make good faith efforts to provide reasonable accommodations for Plaintiff's disability, and failed to engage in an interactive communication with Plaintiff regarding reasonable accommodations that would allow Plaintiff to succeed in her position in the prosthetics department.  As such, the VA is liable because reasonable accommodations were possible.

---

[11]Thus, Plaintiff's claim is timely under 29 C.F.R. § 1614.105(a).

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 21**

1
### iv.    Failure to Assign Plaintiff to a New Position

2    Plaintiff asserts there were at least ten positions available between May and

3  July 2003.  Ms. White opined that Plaintiff was qualified to perform the essential

4  functions of several of these open positions (R. 1753).  Mr. Bedwell testified that

5  he was aware of at least two available positions around this time and he declared

6  that she could have performed the essential job functions of both these positions

7  (R. 1783).

8    Defendants have not produced any evidence to rebut Plaintiff's evidence that

9  there were positions that were available for which she was qualified with

10  reasonable accommodations.  Mr. Williams stated that he reviewed these positions

11  and she was not qualified for any of them (R. 1697).  There is nothing in the

12  record, however, to indicate that Mr. Williams reviewed these positions with a

13  qualified expert to see if any reasonable accommodations would be put in place to

14  allow Plaintiff to perform the essential functions of the positions.  The Court

15  rejects Defendants' argument that there is no evidence that moving Plaintiff to a

16  different position would resolve her underlying inability to read.

17
### v.    Reasonableness of Accommodation

18    Defendants argue that if the Court concludes that Plaintiff was a qualified

19  individual with a disability who was entitled to reasonable accommodation, the VA

20  met its burden when it provided sign interpreters, TTY machines, visual cue

21  alarms, etc. to facilitate the communication difficulties inherent with a deaf person.

22  According to the VA, what Plaintiff was really seeking was to have the VA teach

23  her how to read, or to read for her.  Thus, Plaintiff cannot identify a reasonable

24  accommodation that would have been effective.

25    This reasoning is belied by the testimony of Jennifer White.

26    Ms. White indicated that if she had been contacted by the VA during

27  Plaintiff's tenure there, she would have come into Plaintiff's workplace,

28  interviewed her and Mr. Lounsbury, and examined the manuals she needed to

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 22**

review (R. 1752). She would have recommended a multi-faceted set of accommodations for Plaintiff, including consulting with someone fluent in ASL. *Id.* She would have recommended that a consultant return to train Plaintiff on new materials as needed. (R. 1753). She would have emphasized the visual as a learning tool, since one of Plaintiff's strengths was that she was a visual learner. *Id.* She would have interviewed Plaintiff's supervisor regarding office policies to ensure that this basic information was conveyed to Plaintiff. She would have provided training to Plaintiff's hearing co-workers regarding effective communication with a person who is deaf. *Id.* She would have assessed Plaintiff's skills and advised as to appropriate classes for her to take in order to advance her English skills as needed. *Id.*

Ms. White also stated that in virtually every situation with a deaf employee, she recommends staff-wide training regarding deaf culture, ASL and its differing structure from English, and the attendant need for interpreters to enable deaf people to fully demonstrate their abilities and intelligence in the workplace (R. 1745).

Contrary to the VA's assertions, Plaintiff was seeking and was entitled to more than just learning how to read. The VA's attempts to accommodate Plaintiff fell far short of what is required by the Rehabilitation Act.

### vi. Conclusion

The record demonstrates that Plaintiff was a successful employee with a long work history, who for many years worked at the VAMC without any problems. Her problems started when she was transferred to a new position, and VAMC failed to provide any particularized analysis to determine what accommodations would be necessary to allow Plaintiff to perform the job requirements.

While the record demonstrates that Plaintiff had difficult communicating in English, Plaintiff has established that her reading difficulties could have been

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 23**

accommodated to allow her to be successful in her position as a prosthetics clerk, or prosthetics purchasing agent.  Defendant has failed to provide any contrary testimony, other than the testimony of her supervisor, who reached his own conclusions regarding the time and frequency of the necessary accommodations, even though he was not qualified to do so.  Accordingly, Plaintiff has successfully shown that Defendants failed to accommodate her as required by the Federal Rehabilitation Act.

**(2)    Discriminatory Removal**[12]

A plaintiff alleging disparate treatment must show that (1) she is disabled within the meaning of the statute; (2) she is "otherwise qualified" for the position; (3) she was adversely treated because of her disability; and (4) she worked for a federal agency.  *Reynolds v. Brock*, 815 F.2d 571, 573-74 (9th Cir. 1987).  Once a *prima facie* case has been made, the burden shifts to the Defendants to demonstrate a legitimate, non-discriminatory reason for the action.  *Id.* at 574.  The burden then shifts back to Plaintiff to produce evidence showing that the reason offered by the Defendants was pretextual.  *Id.*

As set forth above, Plaintiff has established a *prima facie* case with regard to her deafness.  The burden then shifts to Defendants to show that it had a legitimate, non-discriminatory reason for removing Plaintiff from her employment.  Defendants rely on the fact that Plaintiff was AWOL for seven months and failed to provide medical documentation to excuse her absence as a legitimate, non-discriminatory reason for removing Plaintiff.

As discussed above, Defendants' request for additional medical documentation was inappropriate, and instead, the proper course of action was to engage with Plaintiff in an interactive discussion to determine reasonable

---

[12]Defendants concede that Plaintiff's claim for discriminatory removal was timely, as she contacted the EEO counselor on July 18, 2003, within 45 days of removal.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 24**

accommodations.  Thus, Defendants are now precluded from relying on the failure to provide the additional documentation as a legitimate, non-discriminatory reason for removing Plaintiff.

The Court concludes that Defendants discriminated against Plaintiff by removing her based on her absence, which was directly caused by their failure to engage in an interactive communication process to develop a reasonable accommodation plan to allow Plaintiff to succeed in her position in the prosthetics department. *See Humphrey*, 239 F.3d at 1139 (recognizing that the link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from the disability).

**(3)    Hostile Work Environment**

Plaintiff acknowledges that the Ninth Circuit has not explicitly ruled on the availablity of a hostile work environment claim based on disability.  *See Brown v. City of Tuscon*, 336 F.3d 1181, 1190 (9th Cir. 2003).  The Fourth, Fifth, and Eighth Circuits have recognized hostile working environment claims under the ADA.  *See Fox v. General Motors Corp.*, 247 F.3d 169, 175 (4th Cir.2001); *Flowers v. Southern Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 719-20 (8th Cir. 2003).  These courts have held that in order to succeed on a claim of disability-based harassment under the ADA, Plaintiff must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcomed harassment; (3) the harassment complained of was based on her disability or disabilities; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) the employer knew or should have known of harassment and failed to take prompt, remedial action.  *Flowers*, 347 F.3d at 235-36.

Plaintiff argues that the harassment consisted of Mr. Lounsbury's failure to

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 25**

1  engage in an interactive accommodation dialogue with Plaintiff, his repeated

2  denials of her requests for accommodation and training, his yelling and gestures,

3  and his dismissive and patronizing e-mails to Plaintiff.

4       In the absence of Ninth Circuit precedent, the Court accepts the rulings of

5  the Fourth, Fifth, and Eighth Circuits that have recognized hostile working

6  environment claims under the ADA.  In reviewing Plaintiff's claims, the Court

7  looks to Title VII case law to determine whether harassment occurred.  *See*

8  *Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th Cir. 2004)(drawing

9  on Title VII precedent to set out plaintiff's burden in an ADA case); *Snead v.*

10 *Metro Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (holding that

11 Title VII analysis applies in ADA cases).  In doing so, the Court must look at "all

12 the circumstances," including "the frequency of the discriminatory conduct; its

13 severity; whether it is physically threatening or humiliating, or a mere offensive

14 utterance; and whether it unreasonably interferes with an employee's work

15 performance" to determine whether an actionable hostile work environment claim

16 exists.  *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).  The

17 Supreme Court has held that "[w]hen the workplace is permeated with

18 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or

19 pervasive to alter the conditions of the victim's employment and create an abusive

20 working environment,' Title VII is violated."  *Harris v. Forklift Sys. Inc.*, 510 U.S.

21 17, 21 (1993).

22      The Court concludes that Plaintiff has not establish a hostile work

23 environment claim based on her disability.  The yelling and gestures, and

24 dismissive and patronizing e-mails do not rise to the level of "harassment", nor do

25 they create a hostile workplace environment.  *See Oncale v. Sundowner Offshore*

26 *Servs., Inc.*, 523 U.S. 75, 80 (1998) (recognizing that Title VII is not a general

27 civility code for the workplace and does not prohibit all employment-related verbal

28 or physical harassment); *see also Brooks v. City of San Mateo*, 229 F.3d 917, 927

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 26**

(9th Cir.2000) ("[N]ot all workplace conduct that may be described as harassment affects a terms, condition, or privilege of employment within the meaning of Title VII.").

Also, it is undisputed that the alleged conduct occurred prior and up to November 20, 2001. There is nothing in the record to indicate that Plaintiff had any contact with Mr. Mr. Lounsbury after this date. A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. *Morgan*, 536 U.S. at 118. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. *Id.* Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability. *Id.*

Here, the alleged acts contributing to the hostile work environment claim—Mr. Lounsbury's failure to engage in an interactive accommodation dialogue with Plaintiff, his repeated denials of her requests for accommodation and training, his yelling and gestures, and his dismissive and patronizing e-mails to Plaintiff—fell outside the statutory time period. Accordingly, Plaintiff's hostile work environment claim fails.

## C.    Review of the MSPB's Decision

The Court will uphold the MSPB's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law, rule, or regulation having been followed; or unsupported by substantial evidence. *Garrett*, 10 F.3d at 1428.

The VA removed Plaintiff on July 11, 2003, on the grounds that Plaintiff was "absent without approved leave (AWOL) for the period of October 21, 2002,

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 27**

through May 9, 2003." To prove a charge of AWOL, the agency must show by preponderance of the evidence that the employee was absent and her absence was not authorized or that her request for leave was properly denied. *Rojas v. United States Postal Servs.*, 74 M.S.P.R. 544, 548 (1997). Preponderance of the evidence is that degree of relevant evidence which a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. *See* 5 C.F.R. § 1201.56(c)(2).

The MSPB reviews the agency's decision denying LWOL (leave without pay) under an abuse of discretion standard. *Wells v. Dep't of Health and Human Servs.*, 29 M.S.P.R. 346, 348 (1985). If the agency's charge of AWOL is sustained, the MSPB will review an agency-imposed penalty only to determine whether the agency considered all of the relevant factors and exercised management discretion within tolerable limits of reasonableness. *Douglas v. Veterans Admin.*, 5 M.S.P.R. 280, 306 (1981).

In issuing the Final Agency Decision, the VA official considered the following in making his decision: Plaintiff's lengthy absence, which was ongoing, the fact that she was unable to say with certainty when she was able to return to work, in any capacity, and the fact that she promised to provide medical evidence covering the AWOL period, yet failed to do so. He also considered Plaintiff's length of service, her past work record, and other extenuating circumstances, such as her deafness and attending "frustrations and challenges." He sustained the charge of AWOL and concluded that the charge was of such gravity that mitigation of the proposed penalty of removal was not warranted.

The MSPB upheld the VA official's decision, finding that the officer considered the relevant factors and exercised his discretion within tolerable limits of reasonableness. The AJ analyzed the removal as a denial of leave without pay by inferring that Plaintiff made a leave request at the May 29, 2003, meeting when she stated that she thought her doctor had supplied medical information to support

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 28**

her absence, even though Plaintiff did not make a formal leave request.[13]  He

sustained the removal because Plaintiff failed to document her medical condition

from October 21, 2002, through May 9, 2003, and found that the agency's choice

of penalty was not so excessive to be an abuse of discretion, nor did it exceed the

maximum reasonable penalty, and affirmed the agency's decision.

With respect to Plaintiff's affirmative defense of disability discrimination,

the AJ found that the accommodation that Plaintiff was seeking was assignment to

another position; or not being under the supervision of Mr. Lounsbury; or extended

leave to cover her absence.  The AJ characterized Plaintiff's claim as not being

based on the fact that she was deaf, but based on the fact of her medical inability to

work under Mr.Lounsbury, and that absent this stressor, she could have performed

the duties as a prostethetics clerk.

The AJ relied on the fact that Plaintiff applied for disability retirement as

evidence that she did not believe that she could work for the agency in any

capacity, with or without accommodation.  Then, after her disability was denied,

Plaintiff failed to give the VA any indication that she intended to return to work, or

that she was medically able to do so.  The AJ determined that at this point the

agency had no obligation to consider accommodating her any further.

The MSPB's affirmation of the VA's removal of Plaintiff was arbitrary and

capricious.  First, the MSPB erred in concluding that the accommodations that

Plaintiff was requesting was assignment to another position; not being under the

supervision of Mr. Lounsbury, or extended leave to cover her absence.  In doing

so, the MSPB failed to address Plaintiff's claim that the VA failed to engage in an

interactive process with the employee regarding accommodation.  The request to

---

[13]The AJ assumed that Plaintiff was incapacitated for duty during the entire
period, so he found it unnecessary to decide whether Plaintiff would reasonably
have felt compelled to remain off work due to harassment, even if she were not
incapacitated.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 29**

not be under the supervision of Mr. Lounsbury was only in response to his failure
to engage in an interactive process with her regarding reasonable accommodations
that would allow Plaintiff to be successful in her job.  In doing so, the MSPB failed
to consider whether the requested medical documentation was necessary in light of
the failure of the Defendants to engage in the interactive process with Plaintiff in
regard to her deafness.

Also, the MSPB incorrectly concluded that the union contract did not
authorize Plaintiff's extended leave.  In doing so, it failed to consider the affect on
the union contract, and whether it was necessary for Plaintiff to provide additional
medical documentation when the documentation she did provide to Defendants
was clear regarding to her work-place injury claim.

The Union Contract clearly states that employees with work-related injuries
or illness are barred from performing duties beyond the limits prescribed by their
treating physicians.[14]  The MSPB concluded that before subsection (B) applies, the

---

[14]Article 29, Section 9, of the applicable collective bargaining agreement
(CBA) provides:

Section 9 - Work-Related Injuries and Illness
A.  Employees must report any and all injuries that are work-related to their
supervisor.  The supervisor will take appropriate action to insure that:
    1.  The employee has the opportunity to report to the Employee Health
Physician or their personal physician for treatment, completion of necessary
reports, etc.;
    2.  Appropriate facility personnel are promptly notified to ensure timely
processing of necessary reports and employee claims.  The Department agrees that
assistance will be given to employees in preparing necessary forms and documents
for submission to the Office of Workers' Compensation Programs (OWCP) and
that employees will be informed of their rights under the Federal Employees'
Compensation Act, as amended in 1974.
B.  An employee who has sustained a work-related injury or illness will be
required to perform duties only to the extent and limits as prescribed by the treating
physician or the Employee Health Physician, as appropriate.  No employee will be
assigned duties when, in the physician's opinion, this would aggravate the
employee's injury or illness.  In the event that the employee's supervisor does not
have limited duty that meets the physician's stated limitations for the employee,
the supervisor will make a good faith effort to locate limited duty work within the
facility that the employee can perform.  If limited duty is not available, the
employee will be placed on continuation of pay, if eligible, or in an appropriate
leave status at the employee's option.  The union may suggest limited duty

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 30**

employee must first file and be granted compensation benefits from the Office of Workers' Compensation Programs. This conclusion is not supported by the plain language of the contract. The plain language of the contract states that section (B) applies to "an employee who has sustained a work-related injury or illness." Section (B) does not state that it applies to an employee who has been granted compensation benefits from the Office of Workers' Compensation Programs. Moreover, John Bedwell the union representative, testified that there is no requirement in the contract that the employee must submit a claim to the Office of Workers Compensation in order to trigger this contract provision (R. 1776). Mr. Bedwell points out that some claims for work-related illnesses or injury might not rise to the level of a compensable workers compensation claim, but would still be covered under the contract. *Id.* Mr. Bedwell states that as soon as the ill employee provides medical documentation, their work situation must be changed, whether or not the employee files a workers compensation claim. *Id.*

Also, the MSPB failed to consider the fact that Plaintiff reported a work-related injury to her supervisor when John Bedwell delivered the doctor's notes to Mr. Lounsbury. It is undisputed that Mr. Lounsbury received notice that Plaintiff was claiming a work-related injury (R. 1777, 1980). Mr. Bedwell provided Mr. Lounsbury with a copy of the treatment plan of Dr. Harold Bailey, M.D., a physician in the VAMC employee health department, regarding her medical condition at the time she left her job on November 19, 2001. *Id.* Mr. Lounsbury also received a separate doctor's note regarding Plaintiff's condition, which he forwarded on to the VAMC Human Resources department. Also, Mr. Bedwell sent an e-mail to Thomas Williams, notifying him that Plaintiff was being placed on medical leave from her current work environment, due to stressors. (R. 711).

The MSPB failed to consider the fact that Mr. Lounsbury failed to meet his

---

opportunities at the facility. The union has the right to represent any unit employee at any state of this procedure.

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 31**

1   obligation under the union contract to insure that appropriate facility personnel are

2   promptly notified to ensure timely processing of necessary reports and employee

3   claims.  The MSPB failed to consider the fact that VAMC failed to provide

4   assistance to Plaintiff in preparing necessary forms and documents for submission

5   to the Officer of Workers' Compensation Programs in November, 2001.

6        Under the union contract Plaintiff was not required to work as long as there

7   were identified stressors at the workplace, and Defendants failed to meet its

8   obligations to help her process her worker's compensation claims, Therefore, the

9   VA's decision that she was AWOL is not supported by substantial evidence,

10  because Plaintiff had a legitimate defense to the AWOL claim.

11       Also, the MSPB inferred that Plaintiff made a formal leave request at the

12  May 29, 2003, meeting when she stated that she thought her doctor had supplied

13  medical information to support her absence.  This inference is not supported by the

14  record.  Plaintiff's statement was made in response to specific demands by

15  Defendants, and was no indication that she was seeking extended leave based on

16  her medical condition.  The MSPB failed to consider the statement made by

17  Plaintiff at that particular meeting that, "I have thought about coming back to work

18  . . . maybe I could.  Maybe the doctor would let me. Maybe there is some work I

19  could do and not get stressed out," as a request for accommodation.  Instead, the

20  MSPB concluded that Plaintiff failed to give the agency any clear indication that

21  she intended to return to work and, consequently, failed to bear her ultimate burden

22  of proving that the agency had an obligation to consider accommodating her

23  further at that point.  This conclusion misconstrues the employer's duty that is set

24  forth in *Humphreys,* as discussed above.

25       If the MSPB would have considered these factors, it would have concluded

26  that Plaintiff's absence was directly related to the failure of Defendants to engage

27  in the interactive process to determine suitable accommodations to allow Plaintiff

28  to be successful in her job.  As such, the VAMC's decision to deny LWOP status

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 32**

and to terminate Plaintiff because she was absent without approved leave was an abuse of discretion.

Consequently, the Court finds the MSPB decision to uphold the agency's termination of Plaintiff's employment to be arbitrary and capricious and not supported by substantial evidence.

**D.    Remedies**

In her trial brief, Plaintiff asks that this Court to overturn the MSPB's ruling and find in her favor on her discrimination and abuse of discretion claims.  In her complaint, Plaintiff requests that the Court overturn and vacate the final decision of the MSPB; declare that Defendants improperly discriminated against her on the basis of her disability; reinstate Plaintiff to her position at VAMC with back wages from November 19, 2001; award Plaintiff compensatory and punitive damages; reverse and remand the MSPB Orders; and award Plaintiff her costs and reasonable attorneys' fees.

No evidence was presented at trial regarding the issue of damages.  No evidence regarding back wages was presented at trial.  Nothing in the briefing suggests the legal authority of the Court to order the requested remedies.  Accordingly, the Court is unable to fashion any remedies without further briefing from the parties.  Within 30 days from the date of this Order, the parties are directed to file briefing regarding the appropriate remedies that should be ordered consistent with these proceedings and this Order.

Accordingly, **IT IS HEREBY ORDERED:**

1.    Within 10 days from the date of this Order, Plaintiff is directed to file briefing regarding the appropriate remedies that should be ordered consistent with these proceedings and this Order.  Defendants shall file their response within 10 days from the date of filing of Plaintiff's briefing.

2.    A telephonic hearing on the issue of remedies is set for **February 22, 2007**, at **9:30 a.m.**, in Spokane, Washington.  The parties should call the Court's

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 33**

conference line at (509) 458-6380 to participate in the hearing.  However, if the parties wish to appear in person, they should contact Michelle Fox, Courtroom Deputy, no later than **February 21, 2007**.

**IT IS SO ORDERED.**  The District Court Executive is hereby directed to enter this Order and to furnish copies to counsel.

**DATED** this 12th day of January, 2007.

*s/ Robert H. Whaley*

ROBERT H. WHALEY
Chief United States District Judge

Q:\CIVIL\2005\Young\ffcl.wpd

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW ~ 34**